**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Bradford Company,             )
                              )
            Plaintiff,        ) Case No. 1:05-CV-449
                              )
    vs.                       )
                              )
Afco Manufacturing, <u>et al.</u>,   )
                              )
                              )
            Defendants.       )

<u>O R D E R</u>

This matter is before the Court on motions for summary judgment filed by Defendant conTeyor North America, Inc. (Doc. Nos. 44, 45, 46) and Plaintiff Bradford Company's motion to disregard new arguments and evidence in Defendant's reply brief, or, in the alternative, motion for leave to file a sur-reply (Doc. No. 58).  For the reasons set forth below, Defendant's motions for summary judgment are not well-taken and are **DENIED.** Plaintiff's motion to disregard new evidence and arguments, or, in the alternative, to file a sur-reply is **MOOT.**

I. <u>Background</u>

Plaintiff Bradford Company ("Bradford") alleges that Defendants conTeyor Multibag System N.V. and conTeyor North America, Inc. have infringed three of its patents.  Specifically, Bradford alleges that Defendants have infringed Claims 1 and 17-20 of U.S. Patent No. 5,725,119 ("the '119 Patent"), Claims 1, 4, and 5 of U.S. Patent No. 6,230,916 ("the '916 Patent"), and Claims 1-4, 10, 11, and 19 of U.S. Patent No. 6,540,096 ("the

1

'096 Patent"). Generally speaking, the patents at issue concern collapsible shipping containers with integrally supported dunnage. On December 5, 2006, the Court issued an order (Doc. No. 67) pursuant to <u>Markman v. Westview Instruments</u>, 52 F.3d 967 (1997), construing the claims at issue in this case.

Defendant conTeyor North America, Inc. ("conTeyor") has filed motions for summary judgment (Doc. Nos. 44, 45, 46) arguing that each of the claims at issue are invalid in light of certain foreign publications. Specifically, conTeyor argues that the '119 Patent is invalid as anticipated by German Patent Application No. DE 4024607 ("the '607 publication"). Doc. No. 44. Alternatively, conTeyor argues that the '119 Patent is invalid as obvious by the '607 publication alone, or in view of the German PCT Application publication No. WO 93/10024 ("the '024 publication").

In its next motion (Doc. No. 45), conTeyor argues that the '916 Patent is invalid as anticipated by the '024 publication. Alternatively, conTeyor argues that the '916 Patent is invalid as obvious by the '024 publication in view of Japanese Utility Model publication no. JP H6-59230 ("the '230 publication").

Finally, conTeyor argues that the '096 Patent is invalid as anticipated by the '024 publication. Doc. No. 46. Alternatively, conTeyor argues that the '096 Patent is invalid as obvious by the '024 publication in light of the '230 publication.

2

In a consolidated memorandum (Doc. No. 51), Bradford, of course, denies that its patents are invalid as anticipated or obvious in light of the foreign prior art references cited by conTeyor.  Additionally, however, Bradford raises several procedural issues.  First, Bradford states that in order to invalidate a claim on the grounds of obviousness, the claim must have been obvious to one skilled in the art prior to the filing of the patent application.  Bradford then points out that in his affidavits, conTeyor's expert, Bart Vermeulen, failed to state when Bradford's claims would have been obvious to one skilled in the art.  Therefore, Bradford argues, conTeyor failed to establish an essential element of its invalidity defense.

Additionally, Bradford points out that conTeyor failed to certify that its translations of the foreign publications are accurate.  Therefore, Bradford contends, conTeyor has failed to submit admissible evidence of relevant prior art.  Without such evidence, Bradford argues, conTeyor's motions for summary judgment must be denied.

Finally, Bradford argues that the colorized drawings from the foreign publications that conTeyor prepared and submitted in support of its motions are not admissible because they were not in existence at the relevant time.  In other words, Bradford argues that these drawings do not constitute prior art.

In its consolidated reply brief (Doc. No. 56), conTeyor addressed and attempted to remedy the procedural deficiencies highlighted by Bradford.  First, conTeyor obtained and submitted

3

certified translations of the foreign publications.  Second, conTeyor submitted a supplemental declaration from its expert which states that a person skilled in the art would have found the inventions obvious prior to the filing date of the patents-in-suit.  Third, and finally, with respect to the colored drawings, conTeyor argues that they are accurate and the Court may rely on them to assist in comparing the claims at issue to the features disclosed in the prior art.

Bradford then filed a motion (Doc. No. 58) for the Court to disregard the alleged new arguments in conTeyor's reply brief, or alternatively, for leave to file a sur-reply brief. Bradford argues that the certified translations of the foreign publications and the supplemental declaration of Mr. Vermeulen constitute new evidence which the Court must disregard or to which it should be permitted to file a supplemental response.

conTeyor filed a memorandum in opposition to this motion (Doc. No. 61).  In its brief, conTeyor argues that its evidence is not new, it merely rebuts the positions taken by Bradford in its memorandum in opposition to the summary judgment motions.  In reply, Bradford argues that conTeyor's submissions are in violation of both the Local Rules of the Court and the Federal Rules of Civil Procedure.  In any event, Bradford contends that conTeyor would not be prejudiced by allowing it to file a sur-reply memorandum.

Because the Court concludes that conTeyor's motions for summary judgment are not well-taken, even in consideration of the

4

alleged improper evidence and arguments, Bradford's motion to disregard or to file a sur-reply brief is **MOOT.**

To assist the reader understand the arguments and analysis relating to the patents-in-suit, the various drawings and comparisons of the prior art references are attached to the appendix at the end of this order.

II. <u>Anticipation</u>

As stated, conTeyor contends that the claims asserted in the patents-in-suit are invalid over certain foreign publications.  In <u>C.R. Bard, Inc. v. M3 Sys., Inc.</u>, 157 F.3d 1340 (Fed. Cir. 1998), the Federal Circuit explained the anticipation defense to a claim of patent infringement:

> To meet the requirements of patentability a device must be new; that is, it must not have been previously known. Section 102(a) requires that the subject matter was not published anywhere, or known or used by others in the United States, before its invention by the patentee.  An invention that does not meet the requirements of novelty in section 102(a) is said to be "anticipated."
>
> When the defense of lack of novelty is based on a printed publication that is asserted to describe the same invention, a finding of anticipation requires that the publication describe all of the elements of the claims, arranged as in the patented device.

<u>Id.</u> at 1349 (internal footnote and citations omitted).  Stated another way, "[e]very element of the claimed invention must be literally present [in the prior art reference], arranged as in the claim."  <u>Richardson v. Suzuki Motor Co., Ltd</u>, 868 F.2d 1226, 1236 (Fed. Cir. 1989).  "The identical invention must be shown as in complete detail as is contained in the patent claim."  <u>Id.</u>  A

5

patent may be invalid as anticipated by a prior foreign printed publication.  35 U.S.C. § 102(b).

A patent is presumed valid, and, therefore, the party asserting invalidity bears the burden of persuasion.  W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983).  Moreover, the party asserting invalidity must prove anticipation by clear and convincing evidence.  Union Carbide Chem. & Plas. Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1188 (Fed. Cir. 2002).  Thus, in this case, conTeyor must demonstrate "by clear and convincing evidence that every limitation of [Bradford's] asserted claims was contained, either expressly or inherently, in a single prior art reference."  Id.   In Pfizer, Inc. v. Apotex, Inc., __F.3d__, No. 2006-1261, 2007 WL 851203 (Fed. Cir. Mar. 22, 2007), the Federal Circuit explained the clear and convincing burden of persuasion:

> The "clear and convincing" standard is an intermediate standard which lies somewhere in between the "beyond a reasonable doubt" and the "preponderance of the evidence" standards of proof. Although an exact definition is elusive, "clear and convincing evidence" has been described as evidence that places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.

Id. at *8 n.5 (internal brackets, quotation marks, and citations omitted).

Finally, because this matter comes before the Court on motions for summary judgment filed by conTeyor, the Court construes the evidence and inferences to be drawn therefrom in

6

Bradford's favor.  Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 722 (Fed. Cir. 2002).  Anticipation is a question of fact. Therefore, the Court may grant summary judgment on anticipation only when there are no genuine factual disputes to be resolved. Id.

### A. The '119 Patent

The abstract of the '119 Patent describes the claimed invention as "[a] reusable and returnable container for holding product therein during shipment and subsequently being returned generally empty of product for reuse[.]"  The body of the container is "configured for being manipulated into an erected position for containing product therein during shipment and for subsequently being manipulated into a collapsed position for reducing the size of the container for return."  Moreover, "[a]n integrated dunnage structure is coupled to the body and is operable for moving into an engagement position when the container body is erected to thereby engage a product placed in the container for shipment."  "The dunnage structure is further operable for moving into a relaxed position when the container body is collapsed so that the container and dunnage structure may be returned together for reuse."  Finally, "[t]he container provides reusable dunnage which is usable with the container when it is shipped and subsequently remains with the container when it is returned for being reused when the container is again shipped."

The following claims of the '119 Patent are at issue in this case:

Claim 1 - A reusable and returnable container for holding product therein during shipment and subsequently being returned generally empty of product for reuse, comprising:

a body having a bottom and at least two side walls coupled to the bottom, the side walls configured for being moveable between an erected position for containing a product placed in the container and a collapsed position for reducing the size of the container for return;

a dunnage structure positioned generally inside of the body, the dunnage structure having an upper edge with a longitudinal axis spanning between said side walls and supported by the side walls, the upper edge forming an opening for receiving product placed in the container for shipment when the side walls are in an erected position;

the upper edge of the dunnage structure operable for flexing transversely to said longitudinal axis to relax the dunnage structure when the side walls are moved to a collapsed position such that the relaxed dunnage structure is generally positioned in the reduced size container for return;

whereby the container provides reusable dunnage which is usable with the container when it is shipped and subsequently remains with the container when it is returned for being reused when the container is again shipped.

Claim 17 - A reusable and returnable container for holding product therein during shipment and subsequently being returned generally empty of product for reuse comprising:

a body configured for being manipulated into an erected position for containing a product placed therein during shipment and for subsequently being manipulated into a collapsed position for reducing the size of the container for return;

8

a dunnage structure coupled to the body and having an upper edge with a longitudinal axis spanning across the body, the dunnage structure operable for moving into an engagement position when the container body is erected to thereby receive a product placed in the container for shipment, the dunnage structure further operable for flexing transversely to said longitudinal axis at the upper edge thereof and moving into a relaxed position when the container body is collapsed so that the container and dunnage structure may be returned together for reuse;

whereby the container provides reusable dunnage which is usable with the container when it is shipped and subsequently remains with the container when it is returned for being reused when the container is again shipped.

Claim 18 - The container of claim 17 wherein the body includes sides and a bottom, the sides being operable for moving, alternatively, between an erected state and a collapsed state when the body is manipulated between an erected position and a collapsed position respectively.

Claim 19 - The container of claim 18 wherein the dunnage structure is coupled to the sides for moving to an engagement position when the sides are erected and moving to a relaxed position when the sides are collapsed.

Claim 20 - The container of claim 17 wherein the dunnage structure is a pouch for holding the product.

Claims 1 and 17 are independent claims and Claims 18, 19, and 20 are dependent claims of Claim 17.

conTeyor contends that the claims in issue as to the '119 Patent are invalid as anticipated by the German Patent Application Publication No. DE 4024607. More specifically, conTeyor argues that the '607 publication anticipates the '119

9

Patent as shown by the preferred embodiments described in Figures 10 and 11 of that patent.  Bradford concedes that the '607 publication constitutes prior art as to the '119 Patent.  Doc. No. 51, at 6.

The '607 publication also discloses a collapsible container.  According to the abstract of the '607 publication:

> The invention relates to a multiple-use package, which also serves as a transport container, intended to replace disposable packages, such as shoeboxes.  The container according to the invention is also intended to be used directly for display in the retail trade and to replace the primarily stationary shelving systems that have been used there up to this point.  This cuts down on not only packaging material, but also personnel costs since the time-consuming unpacking, etc. for display purposes is not required.

> This is achieved in that the container essentially has the form of a collapsible shelf unit, whose intermediate shelves can assume a sufficient inclination to serve at the same time for display, and in which for transport, the articles to be accommodated can be fixed directly to the intermediate shelves without being damaged.  Individual containers can readily be combined to form larger units and can be collapsed to a small volume when empty and transported back for refilling.

Doc. No. 44-6, at 3.  The preferred embodiment of the '607 publication on which conTeyor relies is found at Figures 2a and 2b.  See Appendix 1.

Figure 2a essentially shows a container that is bookshelf-like in appearance, i.e. it has a narrow base, is much taller than it is wide, and has horizontally-oriented shelving. The container is comprised of two side walls 5 with rigid intermediate shelves 4 at the top, bottom, and middle.  Doc. No.

10

44-6, at 14. These rigid intermediate shelves are attached to the side walls by means of hinges 9. Additionally, the top, bottom, and middle rigid intermediate shelves have a hinge joint 11 which allows the shelves to move upward in order to collapse the container. Spaced between the rigid intermediate shelves are flexible intermediate shelves (also numbered 4) made of a textile material. The flexible intermediate shelves are stretched taut when the container is in the unfolded position and hang down when the container is collapsed. A rear wall is not necessary to provide stability to the container, but is required to prevent soiling. The specification indicates that light and inexpensive sheeting or textile material can be used for this purpose. When the container is in the collapsed position its overall length increases, due to the upward movement of the top rigid intermediate shelve, but the overall volume of the container decreases.

Figures 10 and 11 of the '119 Patent show an alternative embodiment of the invention known as a sleeve pack container. Appendix 1. In this embodiment, a container is formed by means of a collapsible sleeve which contains dunnage structures. The sleeve fits into a peripheral groove on a pallet base. The assembly is completed by placing a cover or top on the sleeve. '119 Patent, col. 16, ll. 8-19, 43-44. To disassemble the sleeve pack, the cover is removed from the sleeve and the sleeve is lifted from the pallet base. To collapse the

container, the sleeve is then folded along hinge lines on the side walls.  Id. col. 16, ll. 52-55.

The principal distinction between the embodiments in the '119 Patent and the '607 publication is the orientation of the dunnage structure.  As indicated above, the embodiment disclosed in the '607 publication has horizontally-oriented shelving, i.e., it is a side-loading container.  By contrast, the sleeve-pack container has vertically-oriented dunnage structures, i.e., it is a top-loading container.  conTeyor argues, however, that this is a distinction without a difference because Bradford argued in its claim construction brief that the orientation of the dunnage was not a limitation of the patent.  The Court, however, has since ruled in its claim construction order construing the '119 Patent that the upper edge of the dunnage structure must face upwardly or, more specifically, that "upper edge" means an "edge that faces upwardly (e.g., it does not face sidewardly)".  Doc. No. 67, at 28.

Independent claims 1 and 17 of the '119 Patent both require the dunnage structure of the container to have an "upper edge".  Dependent claims 18, 19, and 20 also contain this limitation by incorporation.  Robotic Vision Sys., Inc. v. View Eng'g, Inc., 189 F.3d 1370, 1376 (Fed. Cir. 1999).  The embodiment depicted in Figures 2a and 2b of the '607 publication does not have a dunnage structure with an "upper edge" because its edges face sidewardly.  Consequently, the '607 publication does not anticipate the '119 Patent because the "upper edge"

12

limitation is not literally present in the '607 publication.  See
Atlas Powder Co. v. E.I. Dupont De Nemours & Co., 750 F.2d 1569,
1574 (Fed. Cir. 1984)("[T]he exclusion of a claimed element from
a prior art reference is enough to negate anticipation by that
reference.").

The Court, therefore, concludes that the '607
publication does not anticipate Claims 1 and 17-20 of the '119
Patent because the dunnage structure of the '607 publication does
not have an "upper edge".  The conclusory assertion of conTeyor's
expert that each limitation of these claims is disclosed in the
'607 publication, Doc. No. 44-16, Vermeulen Aff. ¶ 11, does not
create a genuine issue of material fact, and, therefore, is
disregarded.  Dynacore Holdings Corp. v. U.S. Philips Corp., 363
F.3d 1263, 1277-78 (Fed. Cir. 2004).  Accordingly, conTeyor's
motion for summary judgment on the grounds that these claims are
invalid because they are anticipated by the '607 publication is
not well-taken and is **DENIED.**

B. The '916 Patent

The abstract of the '916 Patent describes the claimed
invention in the same manner as the '119 Patent.  The '916 Patent
is a divisional application of the '119 Patent and thus shares
the same specification as the '119 Patent.  Tr. (Doc. No. 55) at
29.  The following claims of the '916 Patent are at issue in this
case:

Claim 1 - A reusable and returnable rack container for

13

supporting a product thereon during shipment and
subsequently being returned generally empty of
product for reuse comprising:

a frame having a top member, a bottom member and a
plurality of legs extending there between, the legs
configured for being moveable between an erected
position for spacing the top member above the
bottom member to support a product placed on the
rack and a collapsed position for collapsing and
reducing the size of the container for return;

the legs being hinged along their respective
lengths for being folded into the collapsed
position;

a dunnage structure supported by the frame for
receiving a product placed on the rack for shipment
when the legs are in an erected position;

the dunnage structure operable for relaxing when
the legs are in a collapsed position such that the
dunnage structure is generally positioned on the
reduced size rack structure for return;

the dunnage structure movably coupled to the frame
and operable for being moved with respect to said
erected frame to vary the position of the dunnage
structure and the received product within the
container;

whereby, the rack provides reusable dunnage which
is usable with the container when it is shipped and
subsequently remains with the container when it is
returned for being reused when the container is
again shipped.

Claim 4 - The rack container of claim 1 wherein the
legs extend generally vertically between the top and
bottom members, to space the top member above the
bottom member;

Claim 5 - the rack container of claim 1 wherein the
dunnage structure is a pouch for holding the product.

Claims 4 and 5 are dependent claims of independent claim 1.

conTeyor argues that Claims 1, 4 and 5 of the '916
Patent are anticipated by German Patent Application publication
no. WO 93/10024.  Specifically, conTeyor contends that the

14

preferred embodiments depicted in Figures 4 and 5 of the '916

Patent are anticipated by the '024 publication.

>    According to the specification of the '916 Patent:

>    FIG. 4 illustrates a shipping rack container or rack 60
>    which includes a frame having a generally rectangular
>    bottom or base member 62 and a somewhat similarly-
>    shaped top member 64 positioned vertically above the
>    base member 62. Collapsible legs 66 extend between the
>    base member 62 and top member 64 and include hinge
>    elements 68 along their length to provide for
>    collapsing of the legs 66 along a hinge axis 70. The
>    legs are hingedly coupled to the base members 62 and
>    top member 64 by appropriate fasteners, such as rivets
>    or pines 71, 72, respectively, for hinging the legs
>    along axes 73 and 75. The sides of the frame are
>    generally open.

>    FIG. 4 illustrates the rack container or rack 60 of the
>    invention in an erected position for containing and
>    shipping product therein. In accordance with the
>    principles of the present invention, two opposing sides
>    74, 76 of the top member 64 include elongated support
>    rail elements 78, which extend generally the entire
>    length of the sides 74, 76. Flexible support structures
>    or cables 80 span between the rail elements 78 of sides
>    74, 76 and support dunnage structures, such as dunnage
>    pouches 82, on the rack 60. When the frame of rack 60
>    is erected, i.e., when the collapsible legs 66 are in
>    an erected position, the dunnage pouches 82 are
>    suspended by the cables 80 generally above the base
>    member 62 of the rack 60. As disclosed above, the
>    pouches 40 are preferably made of a strong, pliable
>    fabric of cloth or plastic and are sewn or heat sealed
>    at top edges thereof to the cables 80. Preferably,
>    tensioning elements such as springs 83 provide tension
>    on the cables 80 for proper support of the dunnage
>    pouches 82 when filled with product. When a product is
>    placed within the dunnage pouches 82, it is protected
>    from abrasion and damage during shipment. Similar to
>    the dunnage pouches 40 in FIGS. 1-3, the dunnage
>    pouches 82 each have an opening 84 formed between
>    adjacent support cables 80. Once product is loaded into
>    the pouches 82 with the frame of rack 60 in the erected
>    position, the product is ready for shipment either in a
>    single rack or in several racks stacked one on top of
>    another or positioned side-by-side, such as in a truck.
>    The bottom member 62 of the frame may include
>    appropriately formed openings 86 to received the forks

of a forklift.

When the customer has unloaded all of the product from the dunnage pouches 82, rack 60 is collapsible for return shipment to the manufacturer for reuse in future shipments. To that end, the legs 66 of the rack frame are operable to hinge such that the legs fold inwardly toward the center of the rack as illustrated in FIG. 5. Locking structures (not shown) might be utilized with the leg hinge elements 68 to lock the legs in an erected position 66 and to subsequently be engaged to collapse the frame legs 66. To collapse the legs 66, they are pushed inwardly in the direction of arrow 67 to fold at the hinge elements 68. The top ends of the legs pivot along axis 75, while the bottom ends pivot along axis 73 so that the legs 66 may be folded as illustrated in FIG. 5.

'916 Patent, col. 12, ll. 24-67, col.13, ll. 1-10.

The '024 publication discloses an invention for transporting and storing piece goods.  See Appendix 3 & 4.  In this disclosure, the preferred frame structure for the container is a collapsible scissor-type grating or latticework structure. Doc. No. 44-6, at 5.  The dunnage is supported by a row of successive support bars.  The dunnage itself consists of a continuous web of foil or fabric material which is passed over the support bars.  Stated another way, the continuous web of material is woven through the support bars.  This weaving of the web or material creates U-shaped pockets by the draping of the web over the support bars.  The size of the pockets may be regulated by fixing resilient clips fitted over the support bars. In one of the embodiments, the support bars have rollers on their ends which in turn are inserted into C-shaped rails.  Thus, the

16

support bars can slide back and forth across the frame of the container.

The '024 publication also describes, but does not show, a loading and unloading apparatus for the container. It consists of parallel loading rails which can be introduced between the pockets and the rails, but below the support bars. It then appears that the entire dunnage structure is lifted from the container for unloading. Id. at 10-11. Alternatively, the container can be unloaded by means of an unloading frame which pivots away and downward from the main frame of the container. The rollers of the support bars roll forward to the front of the frame. The pocket can then be unloaded. When the pocket is unloaded, the loading frame is pivoted to the frame again and the procedure is repeated. This continues "until all pockets 1 are unloaded, in which case the empty pockets can each be laid in folds outside the loading frame 30." Id. at 14.

Bradford argues that the '024 publication does not anticipate the '916 Patent because the prior art does not disclose a container with an integral dunnage structure. In reply, conTeyor argues that this contention is immaterial since the '916 Patent does not claim integral dunnage structure. The Court observes, however, that Claim 1 of the '916 Patent does teach dunnage structure that is "movably coupled to the frame" of the container. '916 Patent, col. 17 l. 56. Claim 1 also teaches dunnage structure that on collapsing "is generally positioned on the reduced size rack structure for return." Id. col. 17, ll.

17

53-55.  Bradford's use of "integral" perhaps roughly but nonetheless accurately describes the essence of these elements of the dunnage structure of the '916 Patent.  The Court concurs with Bradford that the '027 publication does not disclose an integral dunnage structure.

In its claim construction order, the Court held that "coupled to" means "linked together, connected, or joined."  Doc. No. 67, at 54.  As stated, Claim 1 of the '916 Patent discloses a dunnage structure which is movably coupled to the frame of the container.  In contrast to the '916 Patent, however, the dunnage structure of the '024 publication is coupled to support bars, which in turn fit into rails along the top member of the frame of the container.  Therefore, one of the elements in Claim 1 of the '916 Patent is not present in the '024 publication.  The same is necessarily true for dependent claims 4 and 5 of the '916 Patent. Although this is perhaps a slight difference between the two inventions in teaching dunnage structures, it is sufficient to negate anticipation. See Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983) (stating that a prior art disclosure that "almost meets" all of the elements of the claimed invention does not anticipate).  As a result, the '024 publication does not anticipate each of the claims at issue in the '916 Patent.

The conclusory assertion of conTeyor's expert that each limitation of Claims 1, 4, and 5 of the '916 Patent is found in

18

the '024 publication, Doc. No. 45-13, Vermeulen Aff. ¶ 11, does not create a genuine issue of material fact, and, therefore, is disregarded.  Dynacore Holdings., 363 F.3d at 1277-78. Accordingly, conTeyor's motion for summary judgment on the grounds that the '024 publication anticipates the claims at issue in the '916 Patent is not well-taken and is **DENIED.**

## C. The '096 Patent

The abstract of the '096 Patent describes the claimed invention as "[a] reusable and returnable container for holding product therein during shipment and then being returned for reuse[.]"  The container is comprised of "a body having at least two opposing and moveable side structures, which are configured for being selectively moved into an erected position for shipment and moved into a collapsed position for reducing the size of the container for return."  "A dunnage structure spans between the side structures and is operably coupled to the side structures for moving to an erected position for receiving product when the side structures are erected and moving to a collapsed position in the body when the side structures are collapsed so that the dunnage remains with the container when returned."  In this invention, "[t]he dunnage structure has an open end facing at least one side structure of the body, and the side structure defines an open area which is in alignment with the dunnage structure open end for accessing the dunnage structure and transferring product into and out of the dunnage structure from a side of the container."

19

The following claims are at issue with respect to the
'096 Patent:

Claim 1 – A reusable and returnable container for
holding product therein during shipment and then being
returned for reuse, the container comprising:

a body having at least two opposing and moveable
side structures, the side structures configured for
being selectively moved into an erected position for
shipment and moved into a collapsed position for
reducing the size of the container for return;

a dunnage structure spanning between the side
structures, the dunnage structure being operably
coupled to the side structures for automatically
moving, with the side structures, to an erected
position for receiving product when the side
structures are erected and moving to a collapsed
position when the side structures are collapsed so
that the dunnage remains with the container when
returned;

the dunnage structure having an open end facing at
least one side structure of the body, the at least
one side structure defining an open area which is in
alignment with the dunnage structure open end for
accessing the dunnage structure and transferring
product into and out of the dunnage structure from a
side of the container;

whereby a person may more efficiently and safely
remove product from the container and the container
and dunnage is readily reused;

Claim 2 – The container of claim 1 wherein said at
least one side structure comprises an elongated frame
section positioned along a top edge of the body, the
dunnage structure being coupled to the elongated frame
section for accessing the open end of the dunnage
structure.

Claim 3 – The container of claim 2 wherein said frame
section is hingedly coupled with respect to the body to

20

be selectively hinged between a collapsed and erected
position.

Claim 4 - The container of claim 1 further comprising a
latching structure coupled to the body for securing
at least one of said side structures in the erected
position.

Claim 10 - The container of claim 1 further comprising
rails coupled to the side structures, the dunnage
structure being coupled at its ends to the rails to
span between the rails.

Claim 11 - The container of claim 10 wherein said
dunnage structure comprises a plurality of compartments
coupled at their ends to the rails, the
compartments being slidable along said rails.

Claim 19 - A reusable and returnable container for
holding product therein during shipment and then being
returned for reuse, the container comprising:

a body having at least two opposing and moveable
side structures which are configured for being
selectively moved into an erected position for
shipment and moved into a collapsed position for
reducing the size of the container for return;

at least one side structure comprising an open
frame with a section hingedly coupled with respect
to the body to be selectively hinged between the
collapsed and erected positions;

a dunnage structure spanning between the side
structures, the dunnage structure being operably
coupled to the open frame for moving to an erected
position for receiving product when the frame is
erected and moving to a collapsed position in the
body when the frame is collapsed so that the
dunnage remains with the container when returned;

the dunnage structure having an open end facing the
open frame, the frame defining an open area which
is in alignment with the dunnage structure open end
for accessing the dunnage structure and transferring

21

product into and out of the dunnage structure from the
side of the container;

whereby a person may more efficiently and safely
remove product from the container and the container
and dunnage is readily reused.

Claims 1 and 19 are independent claims. Claims 2-5 and 10-11 are
dependent claims of Claim 1.

conTeyor argues that the '024 publication anticipates
the '096 Patent in the following manner. According to conTeyor's
argument, with respect to the '096 Patent, Bradford claims a
priority date based on the filing of the '119 Patent. The '096
Patent claims a container with the limitation of "transferring
product into and out of the dunnage structure from the side of
the container." conTeyor observes that in the '119 Patent the
only embodiments depicted in which product can be transferred
into and out of the dunnage from the side of the container are
Figures 4 and 5. Therefore, conTeyor argues that Figures 4 and 5
of the '119 Patent are incorporated into the '096 Patent. See
Appendix 5. Consequently, conTeyor argues that the '024
publication anticipates the '096 Patent via Figures 4 and 5 of
the '119 Patent.

In its claim construction order, however, the Court
concluded that the embodiments in Figures 4 and 5 of the '119
Patent do not demonstrate side loading containers. Doc. No. 67,
at 25-28. Therefore, the '096 Patent, which as conTeyor points
out only claims a side-loading container, cannot be construed to

22

encompass Figures 4 and 5 of the '119 Patent.  Accordingly, on the basis asserted by conTeyor, the '096 Patent cannot be invalid as anticipated by the '024 publication.

In any event, conTeyor argues, the '024 publication meets the limitations in Claims 1 and 19 concerning the coupling of the dunnage structures.  Specifically, conTeyor relies on the limitation in Claim 1 of "the dunnage structure being operably coupled to the side structures for automatically moving, with the side structures, to an erected position for receiving product when the side structures are erected and moving to a collapsed position in the body when the side structures are collapsed so that the dunnage remains with the container when returned[.]" See '096 Patent, col. 13, ll. 35-41.  With respect to Claim 19, conTeyor relies on the limitation of "the dunnage structure being operably coupled to the open frame for moving to an erected position for receiving product when the frame is erected and moving to a collapsed position in the body when the frame is collapsed so that the dunnage remains with the container when returned." Id. col. 14, ll. 62-67.  The Court disagrees with conTeyor that these claims are anticipated by the '024 publication.

As the Court explained above with respect to the '916 Patent, the '024 publication discloses dunnage that is coupled to support bars.  In Claim 1 of the '096 Patent, the dunnage structure is operably coupled to the side structures.  In Claim 19 of the '096 Patent, the dunnage structure is operably coupled

23

to an open frame.  Since the coupling of the dunnage structure disclosed in Claims 1 and 19 of the '096 Patent is different from the coupling of the dunnage disclosed in the '024 publication, conTeyor has failed to demonstrate anticipation.  Consequently, it again follows that dependent claims 2-5 and 10-11 are not anticipated by the '024 publication.

The conclusory assertion of conTeyor's expert that each limitation of Claims 1-4, 10, 11, and 19 of the '096 Patent is disclosed in the '024 publication, Doc. No. 46-14, Vermeulen Aff. ¶ 11, does not create a genuine issue of material fact, and, therefore, is disregarded.  Dynacore Holdings, 363 F.3d at 1277-78.  Accordingly, conTeyor's motion for summary judgment on the grounds that the '096 Patent is anticipated by the '024 publication is not well-taken and is **DENIED.**

### III. Obviousness

conTeyor also contends that the patents-in-suit are invalid as obvious over foreign prior art references.  A patent may invalid as obvious even if it has not been anticipated by prior art.  Connell, 722 F.2d at 1548.

An invention is not patentable if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a).  In order to determine whether a patent is invalid as obvious, the fact finder must consider: 1) the scope and content

24

of the prior art; 2) the level of ordinary skill in the art; 3)
the differences between the claimed invention and the prior art;
and 4) secondary considerations of nonobviousness, such as
commercial success, long-felt but unresolved need, failure of
others, copying, and unexpected results. Ruiz v. A.B. Chance
Co., 234 F.3d 654, 662-63 (Fed. Cir. 2000) (citing Graham v. John
Deere & Co., 383 U.S. 1, 17-18 (1966)). The trial court must
consider each of the so-called Graham factors before invalidating
a patent as obvious. Ruiz, 234 F.3d at 663.

    As an initial matter, Bradford argues that conTeyor's
motions for summary judgment must be denied because it failed to
support its obviousness defense with evidence relating to
secondary considerations. Contrary to Bradford's argument,
however, conTeyor bears the initial burden of production to
demonstrate a prima facie case of obviousness based on the first
three Graham factors. Winner Int'l Royalty Corp. v. Wang, 202
F.3d 1340, 1350 (Fed. Cir. 2000). It is, however, the patent
owner's burden of production to adduce evidence on secondary
considerations once the defendant makes a prima facie case of
obviousness. Id. Therefore, conTeyor was not required to
present evidence of secondary considerations in its moving
papers. Accordingly, conTeyor's motions for summary judgment are
not insufficient for failure to address secondary considerations.

    Before dividing the obviousness analysis into
individual sections for each patent-in-suit, the Court notes that
there seems to be no dispute concerning the first and second

<u>Graham</u> factors.  Bradford does not appear to contest that the relevant prior art in this case consists of the '607 publication, the '024 publication and the '230 publication.  As to each of the patents-in-suit, conTeyor argues, and Bradford does not contest, that the level of ordinary skill in the art is relatively high because the hypothetical skilled person would have a four-year packaging engineering degree or its equivalent.  The significance of the ordinary level of skill in the art is that the higher the level of skill, the more likely the claimed invention is obvious. ROBERT L. HARMON, PATENTS AND THE FEDERAL CIRCUIT § 4.3(b) (5th ed. 2001).  Accordingly, for purposes of the pending motions for summary judgment, the Court concludes that the ordinary level of skill in the art is relatively high.

A. <u>The '119 Patent</u>

1. <u>The Differences Between the</u>
<u>Claimed Invention and the Prior Art</u>

conTeyor argues that the '119 Patent is obvious in light of the '607 publication alone or, alternatively, in combination of references from the '607 publication and the '024 publication.  According to conTeyor's expert, a person of ordinary skill in the art would have been motivated to rotate the embodiment in Figures 2a and 2b of the '607 publication (the bookshelf-like container) to a horizontal position to promote stability during shipping and collapsing.  Doc. No. 44-16, Vermeulen Aff. ¶ 15.  conTeyor further notes that rotating this embodiment in this way gives the embodiment in the '607

26

publication vertically oriented dunnage, i.e., transforms it into a top-loading container.  Id.  conTeyor's expert also opines that a person with ordinary skill in the art would have been motivated to add the dunnage pouches disclosed in the '024 publication to the planar dunnage elements disclosed in the '607 publication in order to separate and protect products during shipping.  Id. ¶ 18.  conTeyer's expert then goes on to state, based on this analysis, that "[i]t is my opinion that each and every limitation of claims 1, 17, 18, 19, and 20 of the '119 Patent is at least suggested by the '607 publication alone, and in view of the '024 publication."  Id. ¶ 19.

Bradford's expert, however, states that rotating the embodiment in the '607 publication to a horizontal orientation would defeat its main purpose - to use the same container for shipping and displaying the product.  Doc. No. 51-2, Bradford Aff. ¶ 11.  Bradford's expert also opines that there is no motivation to combine the '607 publication and '024 publication references because addition of the pouched dunnage from the '230 publication to the container of '607 publication would obscure viewing of the product on the shelf.  Id. ¶ 17.

The Court agrees with Bradford that the differences between the claimed invention and the prior art militate against finding a prima facie case of obviousness.  As Bradford correctly argues, rotating the embodiment described in the '607 publication to a horizontal orientation would obviate one of principal advantages of the invention, which is the use of the same

27

shipping container as a display rack for product.  If the '607 publication's container were left in a horizontal position in the store, the dunnage would obscure the product from the customer. At a minimum, it would require the customer to stand directly over the container to view the product.  Alternatively, the container could be rotated back to a vertical position once it reached the store.  However, this would presumably then require the product to be re-oriented within the dunnage for viewing by the customer.  In this scenario, another advantage of the product - reduction of personnel costs incurred by packing and unpacking product - would be obviated.  Where a proposed modification would render the prior art unsatisfactory for its intended purpose, there is not a suggestion or motivation to make the proposed modification.  See MANUAL OF PATENT EXAMINING PROCEDURE § 2143.01 (citing In re Gordon, 733 F.2d 900 (Fed. Cir. 1984)).  Without a suggestion or motivation to make the modification to the prior art proposed by conTeyor, its prima facie case of obviousness fails.

Finally, if there is no suggestion or motivation to rotate the '607 publication embodiment horizontally, it logically follows that there was no motivation or suggestion to combine the '607 publication with the '024 publication.  Leaving the dunnage in the container, which is what conTeyor argues the '024 publication teaches, does not alter the fact that product in the container would still be obscured from view when the container is rotated to a horizontal position.  Nor does leaving the dunnage

28

in the container alter the fact that rotating the container back to a vertical position would require re-orienting the product.

The Court recognizes that a motivation to combine references need not be found in the prior art references, but rather may be found in the knowledge available to one skilled in the art. <u>Cross Med. Prod. Co. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d 1293, 1322 (Fed. Cir. 2005).  conTeyor's expert indeed states that one skilled in the art would be motivated to either rotate the '607 publication embodiment horizontally and/or combine it with the teachings of the '024 publication. Nevertheless, as just discussed, given that the combination of references seems to render the purpose of the '607 publication unsatisfactory, the contrary opinion of conTeyor's expert only establishes that there is a question to resolved by the fact-finder.  It does not, therefore, establish obviousness by clear and convincing evidence.

Because there are questions of fact concerning whether there was a motivation or suggestion in the '607 publication, alone or in combination with the '024 publication, to rotate the embodiment therein horizontally, conTeytor's prima facie case of obviousness as to the '119 Patent fails.

### 3. <u>Secondary Considerations</u>

Because conTeyor failed to establish a prima facie case of obviousness based on the first three <u>Graham</u> factors, the burden of production does not shift to Bradford to adduce

evidence on secondary considerations.  Therefore, the Court does not need to address Bradford's evidence on secondary considerations.  <u>Takeda Chem. Ind., Ltd. v. Mylan Lab., Inc.</u>, 417 F. Supp.2d 341, 385 (S.D.N.Y. 2006); <u>Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.</u>, 304 F. Supp.2d 726, 752 (D.Md. 2004).

### B. <u>The '916 Patent</u>

#### 1. <u>The Differences Between the Claimed Invention and the Prior Art</u>

conTeyor argues that Claims 1, 4, and 5 of the '916 Patent are invalid as obvious over the '024 publication alone or in view of the '230 publication.  As already discussed, the '024 publication discloses a collapsible container in which the dunnage is formed by weaving a web of fabric over a series of support bars.  The parties dispute whether the '024 publication requires the dunnage to be removed from the container during the unloading process.  The Court notes, however, that as described above, the specification of the '024 publication states that the empty pockets can be laid in folds outside the frame.  If the '024 publication requires the dunnage to be removed from the container for unloading, conTeyor's expert opines that a person with ordinary skill in the art would be motivated to replace the empty dunnage in the container prior to collapsing and return of the container.

The embodiment in the '230 publication is similar to the '024 publication in that dunnage is formed by a wave-shaped partition 5 which is hung over support rods 4.[1]  The support rods are attached to reciprocating runners 17 which engage rail grooves 14 in guide rails 3.  In turn, the guide rails are attached to the inner face of the box.  However, in contrast to the '024 publication, which has a frame-like structure, the embodiment of the '230 publication has continuous outer surfaces. The dunnage remains with the container upon collapsing. conTeyor's expert opines that a person of ordinary skill in the art would have been motivated, based on the '230 publication's teaching of dunnage that remains with the container, to leave the dunnage of the '024 publication assembled with the frame during collapsing and return for reuse.

Initially, the Court finds that with respect to the '024 publication, any suggestion or motivation to leave the dunnage with the container for shipping is not from the prior art reference itself.  Although there may be some room for doubt on this question because, as conTeyor notes, the '024 publication does not explicitly preclude leaving the dunnage with the

---

[1]    Bradford argues that one skilled in the art would not look at tote boxes like the one described in the '230 publication to solve problems for racks and dunnage used for industrial packing.  As conTeyor correctly argues, however, in its own words, Figures 6 and 7 of Bradford's '916 Patent describe an embodiment which forms a tote box container or a tote container. '916 Patent, Col. 13, ll. 64-67.  Therefore, to the extent that this is a contention by Bradford that the '230 publication is not within the scope of the relevant prior art, it is not well-taken.

container, it seems implicitly to teach away from that feature based on its discussion of the dunnage being folded outside the frame of the container during unloading.  Additionally, the picture of the folded embodiment does not depict dunnage remaining with the container.  Therefore, any suggestion or motivation to leave dunnage in the container must be through the combination of the two references or not at all.

On review of the '230 publication, the Court finds that, contrary to conTeyor's assertion, it does not teach dunnage that remains with the container, although the dunnage does appear to remain with container upon collapsing.  The problem that the '230 publication seeks to address is reducing the number of types of container boxes needed to ship goods of various sizes.  <u>See</u> Doc. No. 56-4, '230 publication, at 8.  The '230 publication notes that in the prior art, partitions to separate goods from impact with each other were fixed inside the main body of the box.  The prior art container boxes could not stabilize goods whose constitution or shape was smaller than the partition interval and could not accommodate goods whose constitution or shape was larger than the partition interval.  Thus, each container box had to be prepared separately, based on the number of goods to be accommodated, by changing the partition interval.  Thus, the need for a variety of types of container boxes, causing the use of a large amount of storage space and an increase in management costs.  <u>Id.</u>  Accordingly, the purpose of the invention disclosed in the '230 publication "is to provide a container box

32

for goods that improves the operation used to change the interval between partitions, reduces the amount of storage space required, and lowers storage costs." Id. at 9.

In order to achieve the purpose of the invention, the '230 publication generally describes a container box in which the dunnage slides on rails in order to change the partition interval. In contrast to the '916 Patent, the '230 publication is not suggesting or teaching a dunnage structure which collapses or erects with the folding or the unfolding of the container. Rather, the '230 publication is teaching a dunnage structure which, compared to the prior art, is more easily adjusted to accommodate different sized goods. If, according to conTeyor, the import of the '230 publication is that it suggests or teaches that the dunnage remains with the container after collapsing, then this rather broad feature of collapsible containers was already present in prior art that Bradford disclosed in prosecuting the '916 Patent. The Janus reference, U.S. Patent No. 5,211,290, also shows a collapsible container in which the dunnage remains with the container after collapsing. See Appendix 7. Where the Patent & Trade Office has considered a prior art reference, the defendant bears a heavier burden to demonstrate invalidity due to obviousness. Metabolife Lab., Inc. v. Laboratory Corp. of Am. Holdings, 370 F.3d 1354, 1368 (Fed. Cir. 2004). Therefore, because prior art disclosed to the PTO by Bradford also shows dunnage that remains with the container after collapsing, the Court cannot conclude as a matter of law that the

33

combination of the prior art references cited by conTeyor invalidates the '916 Patent as obvious.[2]

Accordingly, the Court finds that conTeyor has failed to establish a prima facie case of obviousness as to the '916 Patent.

### 2. Secondary Considerations

As was the case with the '119 Patent, because conTeyor failed to establish a prima facie case of obviousness based on the first three Graham factors, the burden of production does not shift to Bradford to adduce evidence on secondary considerations. Therefore, the Court does not need to address Bradford's evidence on secondary considerations as they relate to the '916 Patent. Takeda Chem. Ind., Ltd. v. Mylan Lab., Inc., 417 F. Supp.2d 341,

---

[2]    On April 30, 2007, the U.S. Supreme Court issued a decision in KSR, Int't Co. v. Teleflex, Inc., 550 U.S. ___ , No. 04-1350, slip. op. (Apr. 30, 2007), which addressed the teaching, suggestion, and motivation segment of the obviousness analysis. In KSR, the Court made clear that the patentee's claim may be obvious over the prior art even though the prior art was designed to address a different problem. Slip. op. at 16.  In this case, the Court has highlighted the fact that the '230 publication and the '916 Patent address different problems.  Neverthess, it should be clarified here that the basis for the Court's finding that the '916 Patent (and as discussed below, the '096 Patent) is not obvious over the prior art is not that Bradford's patents and the prior art address different problems.  Rather, the basis for the Court's holding is that the proposition for which conTeyor cites the '230 publication, i.e., a person of ordinary skill in the art would have been motivated to leave the dunnage in the container, was a feature of the prior art that Bradford disclosed to the PTO.  Because of that disclosure to the PTO, according to this Court's analysis, the patents-in-issue cannot be invalid as obvious over the '230 publication on the grounds that it also discloses dunnage which remains with the container. Consequently, this Court's obviousness analysis comports with KSR.

385 (S.D.N.Y. 2006); Leviton Mfg. Co., Inc. v. Universal Sec.
Instruments, Inc., 304 F. Supp.2d 726, 752 (D.Md. 2004).

## C. The '096 Patent

Finally, conTeyor contends that the '096 Patent is invalid as obvious over the '024 publication alone or in view of the '203 publication. conTeyor's expert again opines that based on the '024 publication or on the '024 publication in combination with the '230 publication, a person of ordinary skill in the art would have been motivated to leave the dunnage with the container after collapsing. Doc. No. 46-15, Vermeulen Aff. ¶ 20. Based on that contention, the obviousness analysis as to the '096 Patent is identical to the obviousness analysis of the '916 Patent. The Court incorporates by reference that analysis here; conTeyor fails to establish a prima facie case of obviousness as to the '096 Patent for the same reasons. The Court, therefore, need not address the evidence concerning secondary considerations because the burden of production did not shift to Bradford.

## D. Summary

For the reasons stated, conTeyor failed to establish a prima facie case of obviousness as to each of the patents-in-suit. Accordingly, conTeyor's motions for partial summary judgment on the grounds of obviousness are not well-taken and are **DENIED.**

## Conclusion

35

For the reasons stated, Defendant conTeyor North America, Inc.'s motions for partial summary judgment (Doc. Nos. 44, 45, 46) are not well-taken and are **DENIED.** Plaintiff Bradford Company's motion to disregard new arguments and evidence, or, in the alternative, to file a sur-reply brief (Doc. No. 58) is **MOOT.**

        **IT IS SO ORDERED**

Date   April 30, 2007                  s/Sandra S. Beckwith

                                  Sandra S. Beckwith, Chief Judge
                                   United States District Court

## APPENDIX OF EXHIBITS

1. Doc. No. 44, Ex. G (comparison of '119 Patent, Figs. 10 and 11 to '607 publication).

2. Doc. No. 44, Ex. H (alternate comparison of '119 Patent, Figs. 10 and 11 to '607 publication)

3. Doc. No. 45, Ex. G (comparison of '916 Patent, Figs. 1A, 1C, 4 and 5 to '024 publication).

4. Doc. No. 45, Ex. C, pp. 23-33 (drawings from '024 publication).

5. Doc. No. 46, Ex. H (comparison of '096 Patent, Figs. 1A, 1C, 4 and 5 to '024 publication).

6. Doc. No. 46, Ex. F (drawings from '230 publication).

7. Doc. No. 56, Ex. W (Janus, U.S. Patent No. 5,211,290, Figs. 2 and 3).